**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AU-TOMOTIVE GOLD, INC.,
    *Plaintiff-Appellee,*

    v.

VOLKSWAGEN OF AMERICA, INC.;
AUDI OF AMERICA, INC;
VOLKSWAGEN AKTIENGESELLSCHAFT;
AUDI AKTIENGESELLSCHAFT,
    *Defendants-Appellants.*

No. 04-16174

D.C. Nos.
CV-01-00162-WDB
CV-01-00508-WDB

OPINION

Appeal from the United States District Court
for the District of Arizona
William D. Browning, District Judge, Presiding

Argued and Submitted
February 14, 2006—San Francisco, California

Filed August 11, 2006

Before: Arthur L. Alarcón and M. Margaret McKeown,
Circuit Judges, and H. Russel Holland,*
Senior District Judge.

Opinion by Judge McKeown

---

*The Honorable H. Russel Holland, Senior District Judge for the District of Alaska, sitting by designation.

## COUNSEL

Gregory D. Phillips, Howard, Phillips & Anderson, Salt Lake City, Utah; Scott R. Ryther, Howard, Phillips & Anderson, Salt Lake City, Utah, for the defendant-appellant.

H. Kenneth Kudon, Kudon Law Firm, Potomac, Maryland, for the plaintiff-appellee.

# OPINION

McKEOWN, Circuit Judge:

This case centers on the trademarks of two well-known automobile manufacturers—Volkswagen and Audi.[1] The question is whether the Lanham Act prevents a maker of automobile accessories from selling, without a license or other authorization, products bearing exact replicas of the trademarks of these famous car companies. Au-Tomotive Gold, Inc. ("Auto Gold") argues that, as used on its key chains and license plate covers, the logos and marks of Volkswagen and Audi are aesthetic functional elements of the product—that is, they are "the actual benefit that the consumer wishes to purchase"—and are thus unprotected by the trademark laws.

Accepting Auto Gold's position would be the death knell for trademark protection. It would mean that simply because a consumer likes a trademark, or finds it aesthetically pleasing, a competitor could adopt and use the mark on its own products. Thus, a competitor could adopt the distinctive Mercedes circle and tri-point star or the well-known golden arches of McDonald's, all under the rubric of aesthetic functionality.

The doctrine of aesthetic functionality has a somewhat checkered history. In broad strokes, purely aesthetic product features may be protected as a trademark where they are source identifying and are not functional. On the other hand, where an aesthetic product feature serves a "significant non-trademark function," the doctrine may preclude protection as a trademark where doing so would stifle legitimate competition. *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 170 (1995). Taken to its limits, as Auto Gold advocates, this doctrine would permit a competitor to trade on any mark sim-

---

[1]The actual parties are Volkswagen of America, Inc., Audi of America, Inc., Volkswagen Aktiengesellschaft, and Audi Aktiengesellschaft (collectively "Volkswagen and Audi").

ply because there is some "aesthetic" value to the mark that consumers desire. This approach distorts both basic principles of trademark law and the doctrine of functionality in particular.

Auto Gold's incorporation of Volkswagen and Audi marks in its key chains and license plates appears to be nothing more than naked appropriation of the marks. The doctrine of aesthetic functionality does not provide a defense against actions to enforce the trademarks against such poaching. Consequently, we reverse the district court's grant of summary judgment in favor of Auto Gold on the basis of aesthetic functionality. We also reverse the denial of Volkswagen and Audi's motion for summary judgment with respect to infringement and dilution and remand for further proceedings.

## BACKGROUND

Volkswagen and Audi are manufacturers of automobiles, parts and accessories that bear well-known trademarks, including the names Volkswagen and Audi, the encircled VW logo, the interlocking circles of the Audi logo, and the names of individual car models. The marks are registered in the United States and have been in use since the 1950s.[2]

---

[2]A registered mark is "prima facie evidence . . . of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115. The Volkswagen marks were originally registered in the United States in 1965 for products ranging from automobiles and a host of automobile accessories, to a long list of other goods such as medical spitoons, water-skis, credit card services, and teddy bears. Volkswagen recently secured registration for its trademarks with respect to some of the specific product lines at issue in this case. These registrations were pending during the proceedings below; we take judicial notice of their issuance. *See, e.g.*, Registration No. 2,849,974 (June 8, 2006); Registration No. 2,835,662 (April 27, 2004); Registration No. 2,987,620 (Aug. 23, 2005). Audi registered its trademarks for automobiles and a host of other products, including key fobs, in 1986. *See* Registration No. 1,416,583 (Nov. 11, 1986). Other than the recently registered marks, the marks are incontestable. 15 U.S.C. § 1065.

Auto Gold produces and sells automobile accessories to complement specific makes of cars, including Cadillac, Ford, Honda, Lexus, Jeep, Toyota, and others. In 1994, Auto Gold began selling license plates, license plate frames and key chains bearing Volkswagen's distinctive trademarks and, in 1997, began selling similar products bearing Audi's distinctive trademarks. The marks used are exact replicas of the registered trademarks or, in at least some cases, genuine trademark medallions purchased from Volkswagen dealers; Auto Gold states that it "applies authentic [Volkswagen and Audi] logos to its marquee license plates."

According to Auto Gold, its goods serve a unique market. Consumers want these accessories "to match the chrome on their cars; to put something on the empty space where the front license tag would otherwise go; or because the car is a [Volkswagen or Audi], they want a [Volkswagen or Audi]-logo plate." Both Auto Gold and Volkswagen and Audi serve this market. Auto Gold sells its license plates, license plate covers, and key rings with Volkswagen and Audi trademarks to the wholesale market, including car dealers, auto accessory dealers and other merchants. Volkswagen and Audi, for their operations in the United States, license an independent marketing firm to sell license plates, covers, and key chains directly to consumers.

Auto Gold has license and marketing agreements with several car manufacturers, authorizing sales of auto accessories bearing those companies' trademarks. Despite several attempts to secure similar arrangements with Volkswagen and Audi, Auto Gold is not authorized to sell products with their trademarks. Instead, Auto Gold products are accompanied by disclaimers that deny any connection to Volkswagen or Audi. The disclaimers are not visible once the product is removed from the packaging and in use, nor are the disclaimers always clear. For example, some labels state that the product "may or may not" be dealer approved, and Auto Gold's website identifies its goods as "Factory authorized licensed products."

In the mid-1990s, another car maker aggrieved by unauthorized sales of trademarked accessories sued Auto Gold for trademark infringement and obtained an injunction prohibiting Auto Gold from selling any products that incorporate replicas of its registered marks. *See BMW of North America, Inc. v. Au-Tomotive Gold, Inc.*, 1996 WL 1609124 (M.D. Fla., June 19, 1996). Fearful that the decision would invite further trademark claims, Auto Gold filed suit against Volkswagen and Audi in the District of Arizona in 2001. Auto Gold's complaint sought a declaratory judgment that its activities did not constitute trademark infringement or trademark counterfeiting under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), or trademark dilution under 15 U.S.C. § 1125(c). Auto Gold also included claims for interference with prospective economic advantage and trade libel.

Volkswagen and Audi filed counterclaims for trademark infringement under 15 U.S.C. § 1114(1)(a); false designation of origin under 15 U.S.C. § 1125(a); trademark dilution under 15 U.S.C. § 1125(c); consumer fraud under the Arizona Consumer Fraud Act; tortious interference with contract; tortious interference with business expectancy; trademark counterfeiting under the Arizona Consumer Fraud Act; and a request for declaratory judgment as to all claims.

From this point, the case became a maze of counterclaims, stipulated dismissals, and new complaints. This procedural morass was made all the more complicated when some of Volkswagen and Audi's complaints migrated from the original counterclaim to a separate complaint that was later consolidated with the original action. After discovery, Auto Gold filed a motion for partial summary judgment seeking a declaratory judgment that its products do not infringe or counterfeit the Volkswagen and Audi trademarks and do not unfairly compete. Auto Gold's primary argument was that its products were lawful under the "first sale" doctrine. In response, Volkswagen and Audi filed a motion for summary judgment

on their trademark infringement, trademark dilution, and unfair competition claims.

In ruling for Auto Gold, the district court found that "[t]he VW and Audi logos are used not because they signify that the license plate or key ring was manufactured or sold (i.e., as a designation of origin) by Volkswagen or Audi, but because there is a[n] aesthetic quality to the marks that purchasers are interested in having." Concluding that the marks were "protected under the aesthetic functionality doctrine," the district court granted Auto Gold's motion for partial summary judgment, denied the motion for summary judgment filed by Volkswagen and Audi, and entered an order declaring that Auto Gold's "license plates, license plate frames and key chains displaying Volkswagen and Audi trademarks . . . are not trademark infringements and/or trademark counterfeiting."

After supplemental briefing identifying the remaining claims, the district court held that the parties had stipulated to dismiss the trademark dilution claim without prejudice.[3] Volkswagen and Audi moved for leave to amend the complaint to include a dilution claim, which the district court construed as a request for leave to file a second amended counterclaim. The district court denied the motion, holding that amendment would be futile because Volkswagen and Audi could not prevail on the merits of the claim. The court declined to rule on Auto Gold's "first sale" defense. All remaining claims were dismissed with prejudice. On the basis of its previous rulings, the district court enjoined Volkswagen and Audi from enforcing their trademarks against Auto Gold or its customers.

---

[3]The record does not contain any record of a stipulation to dismiss the dilution claim. Volkswagen and Audi argued to the district court that they did not dismiss, but rather inadvertently forgot to include the claim in a later pleading.

On appeal, Volkswagen and Audi ask us to (1) reverse the district court's grant of summary judgment and declaratory relief in favor of Auto Gold, (2) reverse the district court's dismissal of their counterclaims, (3) reverse the district court's denial of their motion for summary judgment, and (4) remand for entry of summary judgment with respect to trademark infringement and trademark dilution.

## ANALYSIS

The central question before us, discussed in Part I, is the scope of the doctrine of the "aesthetic functionality" and its application to the Volkswagen and Audi trademarks as they appear on Auto Gold's products. Part II discusses Volkswagen and Audi's trademark infringement claims, and Part III addresses the trademark dilution claim.

## I. AESTHETIC FUNCTIONALITY

## A. TRADEMARK LAW AND AESTHETIC FUNCTIONALITY

[1] A trademark is a "word, name, symbol, or device" that is intended "to identify and distinguish [the mark holder's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. A valid, registered trademark entitles the holder to prevent others from using the mark where (1) "such use is likely to cause confusion, or to cause mistake or deceive," 15 U.S.C. § 1114(1)(a) (so-called "trademark infringement"), or (2) "such use . . . causes dilution of the distinctive quality of the mark," 15 U.S.C. § 1125(c)(1) (so-called "trademark dilution").

The principal role of trademark law is to ensure that consumers are able to identify the source of goods. *Qualitex*, 514 U.S. at 164. Protecting the source-identifying role of trademarks serves two goals. First, it quickly and easily assures a potential customer that *this* item—the item with the mark—is

made by the same producer as other similarly marked products. At the same time, the law helps "assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.*; *see also Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999).

**[2]** A functional product feature does not, however, enjoy protection under trademark law. *See Qualitex*, 514 U.S. at 164. The Supreme Court has instructed that a feature is functional if it is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.10 (1982). The *Inwood Laboratories* definition is often referred to as "utilitarian" functionality, as it relates to the performance of the product in its intended purpose. Thus, "[t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164.

Extending the functionality doctrine, which aims to protect "useful" product features, to encompass unique logos and insignia is not an easy transition. Famous trademarks have assumed an exalted status of their own in today's consumer culture that cannot neatly be reduced to the historic function of trademark to designate source. Consumers sometimes buy products bearing marks such as the Nike Swoosh, the Playboy bunny ears, the Mercedes tri-point star, the Ferrari stallion, and countless sports franchise logos, for the appeal of the mark itself, without regard to whether it signifies the origin or sponsorship of the product. As demand for these marks has risen, so has litigation over the rights to their use as claimed "functional" aspects of products. *See, e.g.*, *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981) (reversing and remanding for trial a district court determination that the Louis Vuitton logo and trademarked purse material were functional); *Boston Prof. Hockey Ass'n, Inc. v. Dallas Cap &*

*Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir. 1975) (holding that reproductions of professional hockey franchise's logo sold alone are not "functional" and can be protected); *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665 (E.D. Mich. 2002) (holding that a car maker's trademarks are not functional aspects of defendant's car accessories).

The results reached in these various aesthetic functionality cases do not easily weave together to produce a coherent jurisprudence, although as a general matter courts have been loathe to declare unique, identifying logos and names as functional. To understand how the concept of functionality applies to the case before us, broad invocations of principle are not particularly helpful. Instead, we find it useful to follow the chronological development and refinement of the doctrine.

The doctrine of aesthetic functionality is often traced to a comment in the 1938 Restatement of Torts:

> When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended.

Restatement of Torts § 742, comment a (1938) (*see* Restatement 3d of Unfair Competition, § 17 (1995)). Two examples of products with aesthetic functional features were offered, with very little comment—a heart-shaped candy box and a distinctive printing typeface.

Nearly fifteen years later, the doctrine blossomed in *Pagliero v. Wallace China Co.*, an action by Wallace China, a manufacturer of vitrified china, to prohibit a competitor from using a series of decorative patterns and a corresponding list of names. *See* 198 F.2d 339 (9th Cir. 1952). Neither the patterns nor the names were covered by registered trademarks or patents; instead, Wallace claimed secondary meaning, pri-

marily that customers associated the patterns with Wallace, due to extensive advertising and a reputation for quality. *Id.* at 342. In ruling on Wallace's claim, we loosely echoed the 1938 Restatement in articulating the line between aesthetic appeal and functionality:

> [W]here the features are "functional" there is normally no right to relief. "Functional" in this sense might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Id.* at 343 (internal citations omitted).

Applying that test, the china patterns were deemed "functional" because the "attractiveness and eye-appeal" of the design is the primary benefit that consumers seek in purchasing china. *Id.* at 343-44. Thus, Wallace's designs were not "mere arbitrary embellishment," but were at the heart of basic consumer demand for the product and could not be protected as trademarks.

Almost thirty years later, *Pagliero* was revived in a Ninth Circuit case involving an effort by the International Order of Job's Daughters to preclude a jewelry maker from selling jewelry bearing the Job's Daughters insignia. *See Interna-*

*tional Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980). Because the defendant's products bearing the Job's Daughters mark were sold "on the basis of their intrinsic value, not as a designation of origin or sponsorship," the defendant argued that they were functional under *Pagliero. Id.* at 918.

The court acknowledged that a "name or emblem" could, in some cases, "serve simultaneously as a functional component of a product and a trademark," and accordingly called for a "close analysis of the way in which [the defendant] is using the Job's Daughters insignia." *Id.* at 917-19. The court observed that Job's Daughters had submitted no evidence that the defendant's use of the mark either caused confusion as to source or was likely to do so and suggested that the emblem did not designate a source at all.[4] Accordingly, the Job's Daughters insignia, as used by the defendant, was unprotected. *Id.* at 920.

*Job's Daughters*, with its collective mark, was a somewhat unique case and its broad language was soon clarified and narrowed. In *Vuitton*, we confronted bare counterfeiting of Louis Vuitton handbags with minor alterations to the familiar LV logo and fleur-de-lis insignia. 644 F.2d at 774. Not unlike

---

[4]The marks at issue in *Job's Daughters* were "collective marks," which are trademarks "used by the members of a cooperative, an association, or other collective group or organization, . . . and include[ ] marks indicating membership in a union, an association, or other organization." 15 U.S.C. § 1127. This explains, in part, why there was no likelihood of confusion. Because the Job's Daughters insignia was sold by numerous unlicensed jewelers, the possibility that consumers might think that it denoted source was insubstantial. *Accord Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1083 (5th Cir. 1982) ("[T]here is no historical custom or practice—either as to fraternal jewelry or Rainbow jewelry—that would provide a reasonable basis for buyers of Rainbow jewelry to assume that such jewelry can only be manufactured with Rainbow's sponsorship or approval . . . [and] most fraternal associations exercise little control over the manufacture of jewelry bearing their fraternal emblems.").

Auto Gold here, the defendant argued that, under *Pagliero* and *Job's Daughters*, its use of the Vuitton marks was functional because the marks were "related to the reasons consumers purchase [the] product" and that without using the marks, it could not compete with Vuitton in selling Louis Vuitton-marked purses. We rejected these arguments. *Id.* at 773. First, the defendant's use of the Vuitton marks was not functional in a utilitarian sense. *Id.* at 776-77 ("Vuitton luggage without the distinctive trademark would still be the same luggage. It would carry the same number of items, last just as long, and be just as serviceable."). Significantly, in *Vuitton*, we emphatically rejected the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product." *Id.* at 773. Indeed, "a trademark which identifies the source of goods and incidentally services another function may still be entitled to protection." *Id.* at 775. Under *Vuitton*, the mere fact that the mark is the "benefit that the consumer wishes to purchase" will not override trademark protection if the mark is source-identifying. *Id.* at 774. With *Vuitton*, aesthetic functionality was dealt a limiting but not fatal blow; the case was remanded for trial. *Id.* at 776.

Since *Vuitton*, the Ninth Circuit has not directly revisited aesthetic functionality in the context of unique source-identifying trademarks. Several oft-quoted cases involving trade dress claims have criticized the doctrine. *See Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1260 (9th Cir. 2001) ("Nor has this circuit adopted the 'aesthetic functionality' theory, that is, the notion that a purely aesthetic feature can be functional."); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382 n.3 (9th Cir. 1987) ("In this circuit, the 'aesthetic' functionality test has been limited, if not rejected, in favor of the 'utilitarian' functionality test.") (citations omitted).[5] Although a leading commentator described *Clicks Bil-*

---

[5]At least one earlier case explicitly excluded the application of *Pagliero* in the trade dress context, without comment as to its application outside

*liards* as "appear[ing] to mark the final end of the Ninth Circuit's fifty year flirtation with the aesthetic functionality theory," 1 *McCarthy on Trademarks and Unfair Competition* § 7:80 (4th ed.), the doctrine, albeit restricted over the years, retains some limited vitality.

The Supreme Court has yet to address aesthetic functionality as it applies to logos and insignia, in contrast to product features. The Court has, however, outlined the general contours of functionality and aesthetic functionality. As noted earlier, in *Inwood Laboratories*, the Court offered a simple definition of functionality: "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." 456 U.S. at 850 n. 10 (*citing Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122 (1938)).

More recently, in *Qualitex*, the Court considered whether a color (a distinctive green-gold used on dry cleaning press pads) could be protected as a trademark. Observing that color alone can meet the basic legal requirement for a trademark, namely that it acts "as a symbol that distinguishes a firm's goods and identifies their source," the Court concluded that the use of color as a trademark is not *per se* barred by the functionality doctrine. *Qualitex*, 514 U.S. at 165-66 ("And, this latter fact—the fact that sometimes color is not essential to a product's use or purpose and does not affect cost or quality—indicates that the doctrine of 'functionality' does not create an absolute bar to the use of color alone as a mark"). The green-gold color of the dry cleaner pads served a trademark (i.e., source-identifying) function. Additionally, the use of *some* color on the pads served a non-trademark function— namely, to "avoid noticeable stains." *Id.* at 166. The Court

---

of trade dress. *See Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 (9th Cir. 1983) (noting "this court has specifically limited application of the *Pagliero* functionality test to product features and has refused to apply the test to cases involving trade dress and packaging").

underscored, however, that functionality protects against a competitive disadvantage "unrelated to recognition or reputation." *Id.* at 169. Accordingly, because "the [district] court found 'no competitive need in the press pad industry for the green-gold color, since other colors are equally usable,'" functionality did not defeat protection. *Id.* at 166.[6]

The Court's most recent explication of aesthetic functionality is found in a case surprisingly not cited by the parties— *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). In *TrafFix*, a company that held an expired patent for a dual-spring road sign design argued that the visible appearance of the design constituted protectable trade dress. In considering whether the dual spring mechanism was a functional aspect of the product, the Court clarified *Qualitex*'s emphasis on competitive necessity and the overall test for functionality. Rather than paraphrase the decision, and to be absolutely clear, we quote extensively from the passages that set out the appropriate inquiry for functionality.

The Supreme Court emphasized that *Qualitex* did not displace the traditional *Inwood Laboratories* utilitarian definition of functionality. " '[I]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " *TrafFix*, 532 U.S. at 32 (*quoting Qualitex*, 514 U.S. at 165); *see also Inwood Labs.*, 456 U.S. at 850 n.10. The Court noted that *Qualitex* "expand[ed] upon" the *Inwood Laboratories* definition, by observing that "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.' " *TrafFix*, 532 U.S. at 32 (*quoting Qualitex*, 514 U.S. at 165) (alteration in original).

---

[6]In contrast, an example of an aesthetic product feature the protection of which *would* hinder legitimate competition is the use of color to signify the type of medication in pills—the question addressed in *Inwood Laboratories*. *See* 456 U.S. at 853 (noting that "[s]ome patients commingle medications in a container and rely on color to differentiate one from another").

The Court explained the interplay between these two statements of functionality. If a feature is functional under *Inwood Laboratories*, the inquiry ends and the feature cannot be protected under trademark law. *Id.* As the Court elaborated, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33. Thus, in *TrafFix*, once the dual-spring mechanism met the traditional functionality test by making the signs more wind resistant, "there [was] no need to proceed further to consider if there is competitive necessity for the feature" and likewise no need "to engage . . . in speculation about other design possibilities." *Id.* at 33.

By contrast, the Court went on to suggest that "[i]t is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of aesthetic functionality, the question involved in *Qualitex*." *Id.* The Court described aesthetic functionality as "the central question [in *Qualitex*], there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality." *Id.*[7]

As to functionality, we read the Court's decision to mean that consideration of competitive necessity may be an appropriate but not necessary element of the functionality analysis. If a design is determined to be functional under the traditional test of *Inwood Laboratories* there is no need to go further to consider indicia of competitive necessity, such as the availability of alternative designs. *Accord Valu Eng'g, Inc. v. Rex-*

---

[7]The Court's treatment of *Qualitex* in *TrafFix* has caused some consternation among commentators. *See, e.g.*, 1 *McCarthy on Trademark and Unfair Competition* § 7.80 (4th ed.) (describing as "amazing and incomprehensible" the statement in *TrafFix* "that in the 1995 *Qualitex* case, 'aesthetic functionality was the central question.' "); Jerome Gilson, *Trademark Protection and Practice* § 2A.04[5][b] (2006) ("The Supreme Court was incorrect in *TrafFix* to declare that aesthetic functionality was the 'central question' in the *Qualitex* case. The central question in *Qualitex* was whether color alone could serve as a valid trademark.").

*nord Corp.*, 278 F.3d 1268, 1275-76 (Fed. Cir. 2002). However, in the context of aesthetic functionality, such considerations may come into play because a "functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation related disadvantage.' " *TrafFix*, 532 U.S. at 32 (quoting *Qualitex*, 514 U.S. at 165); *see also Dippin' Dots, Inc. v. Frosty Bites Distrib., L.L.C.*, 369 F.3d 1197, 1203 (11th Cir. 2004); *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 356 (5th Cir. 2002).

## B.  AESTHETIC FUNCTIONALITY AND AUTO GOLD'S USE OF VOLKSWAGEN AND AUDI'S PRODUCTS

**[3]** So where do we stand in the wake of forty years of trademark law scattered with references to aesthetic functionality? After *Qualitex* and *TrafFix*, the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the *Inwood Laboratories* definition of functionality—"essential to the use or purpose of the article [or] affects [its] cost or quality." *TrafFix*, 532 U.S. at 32-33 (*citing Inwood Laboratories*, 456 U.S. at 850, n.10). If this is the case, the inquiry is over —the feature is functional and not protected.[8] *TrafFix*, 532 U.S. at 33. In the case of a claim of aesthetic functionality, an

---

[8]Our long-standing test for functionality largely excluded aesthetic considerations, instead asking: (1) whether the feature delivers any utilitarian advantage, (2) whether alternative designs are possible, (3) whether advertising touts utilitarian benefits of the feature, and (4) whether the feature results in economies in manufacture or use. *See Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1006-09 (9th Cir. 1998) (applying the four factors to conclude that the design of disc golf holes was utilitarian). Following *TrafFix*, we reiterated the *Disc Golf* factors as legitimate considerations in determining whether a product feature is functional. *Talking Rain Beverage Co. v. South Beach Beverage Co.*, 349 F.3d 601, 603-04 (9th Cir. 2003) (applying the four factors to conclude that a bottle design was utilitarian). We noted that "the existence of alternative designs cannot negate a trademark's functionality," but "may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product." *Id.* at 603.

alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage. *Id.*; *and see also Qualitex*, 514 U.S. at 165.

**[4]** We now address the marks at issue in this case. Volkswagen and Audi's trademarks are registered and incontestable, and are thus presumed to be valid, distinctive and nonfunctional. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868-69 (8th Cir. 1994). Auto Gold, thus, must show that the marks are functional under the test set forth above. To satisfy this requirement, Auto Gold argues that Volkswagen and Audi trademarks are functional features of its products because "the trademark is the feature of the product which constitutes the actual benefit the consumer wishes to purchase." While that may be so, the fact that a trademark is desirable does not, and should not, render it unprotectable. Auto Gold has not shown that Volkswagen and Audi's marks are functional features of Auto Gold's products. The marks are thus entitled to trademark protection.

**[5]** At the first step, there is no evidence on the record, and Auto Gold does not argue, that Volkswagen and Audi's trademarks are functional under the utilitarian definition in *Inwood Laboratories* as applied in the Ninth Circuit in *Talking Rain*. *See* 349 F.3d at 603-04. That is to say, Auto Gold's products would still frame license plates and hold keys just as well without the famed marks. Similarly, use of the marks does not alter the cost structure or add to the quality of the products.

**[6]** We next ask whether Volkswagen and Audi's marks, as they appear on Auto Gold's products, perform some function such that the " 'exclusive use of [the marks] would put competitors at a significant non-reputation-related disadvantage.' " *TrafFix*, 532 U.S. at 32 (*quoting Qualitex*, 532 U.S. at 165). As an initial matter, Auto Gold's proffered rational—that the trademarks "constitute[ ] the actual benefit the consumer wishes to purchase"—flies in the face of existing

caselaw. We have squarely rejected the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product." *Vuitton*, 644 F.2d at 773. Such a rule would eviscerate the very competitive policies that functionality seeks to protect. This approach is consistent with the view of our sister circuits. *See e.g.*, *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 539 (5th Cir. 1998) ("To define functionality based upon commercial success . . . does not promote innovation, nor does it promote competition.") *superceded on other grounds as recognized in Eppendorf-Netheler-Hinz*, 289 F.3d at 356; *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 341-43 (7th Cir. 1985); *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 825 (3d Cir. 1981) ("The difficulty with accepting such a broad view of aesthetic functionality, which relates the doctrine to the commercial desirability of the feature at issue without consideration of its utilitarian function, is that it provides a disincentive for development of imaginative and attractive design. The more appealing the design, the less protection it would receive.").

**[7]** Even viewing Auto Gold's position generously, the rule it advocates injects unwarranted breadth into our caselaw. *Pagliero*, *Job's Daughters*, and their progeny were careful to prevent "the use of a trademark to monopolize a design feature which, *in itself and apart from its identification of source*, improves the usefulness or appeal of the object it adorns." *Vuitton*, 644 F.2d at 774 (*discussing Pagliero*, 198 F.2d 339) (emphasis added). The concept of an "aesthetic" function that is non-trademark-related has enjoyed only limited application. In practice, aesthetic functionality has been limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function. *See Qualitex*, 514 U.S. at 166 (coloring dry cleaning pads served nontrademark purpose by avoiding visible stains); *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 342 (7th Cir. 1998) (coloring edges of cookbook pages served nontrademark purpose by avoiding color "bleeding" between pages);

*Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1532 (Fed. Cir. 1994) (color black served nontrademark purpose by reducing the apparent size of outboard boat engine); *Pagliero*, 198 F.2d at 343 (china patterns at issue were attractive and served nontrademark purpose because "one of the essential selling features of hotel china, if, indeed, not the primary, is the design").

It is difficult to extrapolate from cases involving a true aesthetically functional feature, like a box shape or certain uses of color, to cases involving well-known registered logos and company names, which generally have no function apart from their association with the trademark holder. The present case illustrates the point well, as the use of Volkswagen and Audi's marks is neither aesthetic nor independent of source identification. That is to say, there is no evidence that consumers buy Auto Gold's products solely because of their "intrinsic" aesthetic appeal. Instead, the alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature.

By Auto Gold's strident admission, consumers want "Audi" and "Volkswagen" accessories, not beautiful accessories. This consumer demand is difficult to quarantine from the source identification and reputation-enhancing value of the trademarks themselves. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1030-31 (9th Cir. 2004) ("Nothing about the marks used to identify [the trademark holder's] products is a functional part of the design of those products. . . . The fact that the marks make [the junior user's product] more functional is irrelevant."). The demand for Auto Gold's products is inextricably tied to the trademarks themselves. *See Qualitex*, 514 U.S. at 170 (identifying "legitimate (*nontrademark-related*) competition" as the relevant focus in determining functionality) (emphasis added).[9] Any

---

[9]Auto Gold complains that if precluded from using the famous marks, it would be unable to compete in the market for auto accessories bearing

disadvantage Auto Gold claims in not being able to sell Volkswagen or Audi marked goods is tied to the reputation and association with Volkswagen and Audi.

In the end, we take comfort that the doctrine of aesthetic functionality, as we apply it in this case, has simply returned from whence it came. The 1938 Restatement of Torts includes this reminder of the difference between an aesthetic function and a trademark function:

> A feature which merely associates goods with a particular source may be, like a trade-mark or trade name, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design.

Restatement of Torts § 742, comment a (1938). Volkswagen and Audi's trademarks undoubtedly increase the marketability of Auto Gold's products. But their "entire significance" lies in the demand for goods bearing those non-functional marks. Today, as in 1938, such poaching is not countenanced by the trademark laws.

[8] We hold that Volkswagen and Audi's marks are not functional aspects of Auto Gold's products. These marks, which are registered and have achieved incontestable status, are properly protected under the Lanham Act against infringement, dilution, false designation of source and other misappropriations.

---

Volkswagen and Audi's marks. This argument is just another way of saying "If I can't trade on your trademark, I can't compete." But this argument has no traction here because the mark is not a functional feature that places a competitor at a "significant non-reputation-related advantage." *TrafFix*, 532 U.S. at 33.

## II.  VOLKSWAGEN AND AUDI'S INFRINGEMENT CLAIM

Although we conclude that Volkswagen and Audi's registered trademarks are not "functional," and thus are protectable, it remains to be determined whether Auto Gold is infringing those marks. *Cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) (although mark was protected, "the [markholder]'s success is still subject to 'proof of infringement' "). The district court concluded that "[w]hile [Volkswagen and Audi] have attempted to make a prima facie case of trademark infringement and dilution of their mark, this situation does not rise to that level." Operating on the premise that the Volkswagen and Audi marks were unprotectable under the doctrine of aesthetic functionality, the district court erroneously concluded Volkswagen and Audi "offered insufficient evidence to show that there is a question of material fact that might lead a factfinder to conclude that infringement of their trademarks occurred." In particular, the district court resolved that Volkswagen and Audi "failed to offer any evidence that would have a tendency to show that there is a likelihood of or any actual confusion in the minds of consumers."

The court then granted Auto Gold's motion for partial summary judgment and denied Volkswagen and Audi's motion for summary judgment which included a claim for infringement. The court declared that Auto Gold's use of the marks on its products was neither trademark infringement nor trademark counterfeiting, and enjoined Volkswagen and Audi from asserting any trademark rights against Auto Gold. In doing so, the district court appeared to merge the aesthetic functionality analysis and the likelihood of confusion analysis as to infringement, but nonetheless based its judgment on both issues. These are distinct inquiries and thus we consider infringement on appeal.

Volkswagen and Audi seek protection under § 1114(1)(a), which provides civil penalties against:

> Any person who shall, without consent of the [registered owner] . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

It is undisputed that Volkswagen and Audi own the registered trademarks at issue, and that Auto Gold uses those trademarks in commerce, without their consent, and in connection with the sale of goods. Thus, as with many infringement claims, the central issue is whether Auto Gold's use of the marks is "likely to cause confusion" within the meaning of the Lanham Act.

Before us on appeal are the parties' cross-motions for summary judgment on the issue of trademark infringement, and in particular, the district court's determination that Volkswagen and Audi had not offered any evidence showing a likelihood of confusion. We review de novo the district court's decision on summary judgment. *Clicks Billiards*, 251 F.3d at 1257.

Because the likelihood of confusion is often a fact-intensive inquiry, courts are generally reluctant to decide this issue at the summary judgment stage. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901-02 (9th Cir. 2002). However, in cases where the evidence is clear and tilts heavily in favor of a likelihood of confusion, we have not hesitated to affirm summary judgment on this point. *See, e.g.*, *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004) (affirming summary judgment where the marks were "legally identical," the goods at issue were related, and the marketing channels overlapped). As part of our de novo review, we conclude as a matter of law that likelihood of confusion is clear cut here and that Volkswagen and Audi have made out a prima facie case of infringement. We do not direct

judgment on this issue, however, because the district court reserved judgment on Auto Gold's defense of "first sale." The case must be remanded for consideration of Auto Gold's defenses.

**[9]** A "[l]ikelihood of confusion 'exists when customers viewing [a] mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark.' " *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987) (*quoting Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir. 1984)). The Ninth Circuit employs an eight-factor test (the "*Sleekcraft*" factors) to determine the likelihood of confusion: (1) strength of the mark(s); (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) defendant's intent; (8) likelihood of expansion. *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631 (9th Cir. 2005); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These elements are not applied mechanically; courts may examine some or all of the factors, depending on their relevance and importance. *See Surfvivor*, 406 F.3d at 631; *Thane Int'l*, 305 F.3d at 901 ("The list of factors is not a score-card —whether a party wins a majority of the factors is not the point. Nor should the factors be rigidly weighed; we do not count beans.") (internal punctuation and citations omitted).

This case presents an easy analysis in terms of likelihood of confusion. The Volkswagen and Audi marks, which are registered and have been in use for more than fifty years, are strong, distinctive marks, the first factor in the *Sleekcraft* analysis. Auto Gold's products, which incorporate *exact* copies of those marks, compete with accessories sold by Volkswagen and Audi through their licensed marketers, and are related[10] to Volkswagen and Audi's primary goods—cars.

---

[10]"Related goods are 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.' " *Sleekcraft*, 599 F.2d at 348 n.10 (*quoting Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945)).

Although Volkswagen and Audi license their marks to third parties, and Auto Gold sells its products to the wholesale market, the ultimate consumers are the same. In fact, according to Auto Gold, it is a very specific sub-group of consumers that wants either Auto Gold's or Volkswagen and Audi's accessories—Audi or Volkswagen car owners who want accessories to match their cars. Thus, in addition to being related products bearing identical marks, the products at issue are destined for the same buyers.

We turn next to the degree of consumer care. Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items. In evaluating this factor, we consider "the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. The class of products Auto Gold sells are relatively inexpensive and unsophisticated, and do not require a great deal of precision or care to fulfill their purpose. This factor favors Volkswagen and Audi.

Evaluation of Auto Gold's intent in using the mark is the seventh factor. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* at 354. Auto Gold knowingly and intentionally appropriated the exact trademarks of Volkswagen and Audi. Auto Gold argues, however, that it does not "intend" to deceive the public as to the source of the goods, but merely sought to fill a market demand for auto accessories bearing the marks. This argument is simply a recasting of aesthetic functionality. Even if we credit Auto Gold's proffered lack of intent, the direct counterfeiting undermines this argument. This factor tips against Auto Gold.

Finally, we examine the factor that is hotly contested by the parties—evidence of actual confusion. Despite the debate, there is no material issue of fact. The district court correctly noted that Volkswagen and Audi offered no evidence of

actual confusion. The question, then, is what is the legal significance of this uncontested fact?

As we noted in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, "[t]he failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." 174 F.3d 1036, 1050 (9th Cir. 1999). In this case, which involves a national market and a low degree of consumer care, nothing suggests that the lack of evidence of confusion should be particularly noteworthy. *Compare Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002) (ascribing some significance to the lack of evidence of confusion where "the parties used the same trademark in the same city for six years," and the product at issue, veterinary services, was one for which consumers are "particularly attentive.").

Auto Gold suggests that the disclaimers on its packaging dispel any potential for confusion. Courts have been justifiably skeptical of such devices—particularly when exact copying is involved. *See, e.g.*, *Pebble Beach*, 155 F.3d at 543 (upholding lower court determination that disclaimers were "inadequate where present and . . . absent from the majority of advertisements and promotional materials"), *superseded on other grounds as recognized in Eppendorf-Netheler-Hinz*, 289 F.3d at 356; *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) ("[W]here the infringement in issue is a verbatim copying . . . plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers.").

Even if disclaimers may in some cases limit the potential for confusion, here they do not. Auto Gold's disclaimers were neither consistent nor comprehensive. We note, preliminarily, that the effectiveness of these disclaimers is undercut by their

sometimes contradictory messages. For example, some labels placed on the cardboard inner lining of the license plate covers state that the product "may or may not" be dealer approved. Visible through the clear cellophane outer wrapping, these disclaimers are sometimes next to disclaimers stating "[t]his product is not endorsed, manufactured, or licensed by the vehicle manufacturer." There are also messages on Auto Gold's website that identify their products generally as "Factory authorized licensed products."

More importantly, "[t]he law in the Ninth Circuit is clear that 'post-purchase confusion,' *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act." *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 854 (9th Cir. 2002); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (affirming a finding of infringement against a jeans maker, and noting that "point of sale materials [such as disclaimers] are removed by the purchaser and have no confusion-obviating effect when the pants are worn").[11] Shorn of their disclaimer-covered packaging, Auto Gold's products display no indication visible to the general public that the items are not associated with Audi or Volkswagen. The disclaimers do nothing to dispel post-purchase confusion.

In sum, Volkswagen and Audi do not present evidence of actual confusion. Neither, however, does Auto Gold present evidence that the disclaimers have any effect. At best, the confusion factor is in equipoise.

---

[11]This definition of confusion reflects the 1962 amendments to § 1114 that broadened the definition of actionable confusion to include non-purchasers (such as those seeing an item of clothing on the street), through deletion of language that limited such confusion to "purchasers as to the source or origin of such goods or services." Pub. L. 87-772 (1962). *See Karl Storz*, 285 F.3d at 854.

**[10]** In the final analysis, we must consider the *Sleekcraft* factors as a whole to determine whether a likelihood of confusion results from Auto Gold's use of the marks. Although we do not bean count, it is significant that six of the eight *Sleekcraft* factors support a likelihood of confusion; the remaining two are either neutral or irrelevant.[12] Most importantly, the strength of Volkswagen and Audi's marks, Auto Gold's intentional and exact copying of the marks, and the direct competition for a specific and limited consumer group, all weigh heavily in favor of a likelihood of confusion. Our *Sleekcraft* analysis benefits from a record developed through lengthy discovery, and the key facts are undisputed. Volkswagen and Audi have established a prima facie "exclusive right to use the . . . mark in commerce." 15 U.S.C. § 1115(b). Accordingly, we reverse the district court's denial of summary judgment in favor of Volkswagen and Audi on the issue of infringement and remand for consideration of the "first sale" defense and any other related claims or defenses.

## III.   OTHER CLAIMS

**[11]** The district court dismissed various of Volkswagen and Audi's counterclaims with prejudice, some because the parties stipulated to their dismissal. Among the counterclaims dismissed was the dilution claim. The procedural history surrounding this claim is murky. The district court found that Volkswagen and Audi had agreed not to litigate the claim even though the parties briefed and argued the issue on summary judgment. Nonetheless, the court denied Volkswagen and Audi's motion for leave to amend because the amendment would be futile. Because the denial of this motion was

---

[12]The final factor, "[a] likelihood of expansion in product lines," warrants no discussion as it is "relatively unimportant where two companies already compete to a significant extent." *Brookfield Commc'ns*, 174 F.3d at 1060. The record reflects that Volkswagen and Audi compete through their licensees with Auto Gold with respect to the products at issue in this suit.

predicated in large part on the court's misapprehension of the application of aesthetic functionality, we reverse the dismissal of the dilution claim.

We reverse the district court's April 7, 2003 order granting Auto Gold's Motion for Partial Summary Judgment and denying Volkswagen and Audi's Motion for Summary Judgment, vacate the May 17, 2003 Order Granting Declaratory and Injunctive Relief, reverse the June 11, 2003 Order Denying Volkswagen and Audi's Motion for Clarification and for Leave to Amend with respect to the dilution claim, vacate all other aspects of the June 11, 2003 Order, and reverse judgment in favor of Auto Gold.

**REVERSED**, **VACATED** and **REMANDED** for further proceedings consistent with this opinion, including our determination that Volkswagen and Audi have established a prima facie case with respect to infringement.